IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | NO. 3:14-cr-00182 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| | ) | |
| TIMOTHY W. THOMAS | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant's "Emergency Sealed Motion to Modify Sentence" (Doc. No. 287, "Motion"), filed *pro se*, wherein Defendant seeks a modification of his 66-month sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Defendant has a rare form of rectal cancer known as a gastrointestinal stromal tumor, or GIST. Thus, Defendant asserts that he is entitled to compassionate release "because he is suffering from a medical condition that potentially compromises his immune system and makes him susceptible to COVID-19." (Doc. No. 287 at 3).

Defendant has submitted a flurry of letters and filings to the Court in relation to his request for modification of sentence (also referred to in this Order as his request for "compassionate release"). The first of these was on April 28, 2020, when he mailed to the Court his "Emergency Sealed Motion to Modify Sentence" (Doc. No. 287). The Court denied this motion without prejudice for failure to show that he had exhausted his administrative remedies; however, the Court explained that he could renew his motion once he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons [("BOP")] to bring a motion [for compassionate release] on his behalf or the lapse of 30 days from the receipt of such a request by the warden of [FCI Butner], whichever is earlier." (Doc. No. 289 at 3). Thereafter, on June 8, 2020, Defendant submitted documentation demonstrating that he had exhausted his administrative remedies—the

BOP had denied his request for compassionate release on March 30, 2020. (Doc. No. 291-2 at 3). In light of this documentation, the Court considered Defendant's Emergency Motion to Modify Sentence renewed and ordered the Government to respond. (Doc. No. 292). The Government filed a response (Doc. No. 296) and a supplemental response (Doc. No. 304) to the motion. In addition, Defendant has sent several letters and documents to the court that the Court will construe as supplements to his originally filed motion. (Doc. Nos. 297-299, 301-303, 305-306).

## PROCEDURAL BACKGROUND

The Government has recounted the procedural history of this matter in great (but necessary) detail. The Court finds that recitation to be accurate; thus, for the sake of judicial efficiency, the Court will repeat pertinent portions of the Government's presentation of the procedural background here:

### A. Offense Conduct

For many years, [Defendant] ran a company that marketed so-called "association memberships" to people looking for major medical health insurance. (DE# 220, PSR, PageID#: 850-51.) [Defendant] changed the company's name many times over the years—United Benefits of America, United States Benefits, Health Care America, and others (collectively, "UBA")—but its underlying purpose was the same. (*Id.* at PageID#: 850-52.) That purpose was to make money for [Defendant] and the company's top salespeople by using aggressive sales tactics to persuade consumers that UBA's products were as good as, or better than, major medical health insurance. (*Id.*)

. . .

[I]n August of 2010, the Federal Trade Commission and the State of Tennessee filed a complaint for a permanent injunction against [Defendant], his wife, and UBA. (DE# 220, PSR, PageID#: 854.) The Court then granted the FTC's motion for a temporary restraining order and asset freeze. (DE# 198, Govt. Sentencing Mem., PageID#: 717 (citing FTC v. United Benefits, LLC, M.D. Tenn. Case No. 3:10-cv-733, Doc. No. 12); DE# 220, PSR, PageID#: 854.)

On August 5, 2010, the FTC, the State, and others arrived at UBA's offices and told [Defendant] and his employees that the company was being taken into receivership. (DE# 220, PSR, PageID#: 854.) The court-appointed receiver read

[Defendant] the TRO, including the portion restraining and enjoining him from transferring, dissipating, disbursing, spending, withdrawing, or otherwise disposing of any funds or other assets that he owned, controlled, or possessed. (*Id.*)

Shortly before the FTC's arrival that morning, [Defendant] had told his broker at Morgan Keegan that he wanted to make a large deposit into his account. (*Id.*) Specifically, at 9:46 am, [Defendant] had emailed the broker to say, "i have 411,000 to deposit in my acct please comke get checks today" [sic]. (Id.) After being informed of the asset freeze, however, [Defendant] abruptly switched gears: rather than wanting to deposit $411,000 into his account, he told the broker that he wanted to clear out all of his accounts at Morgan Keegan, and would be coming by immediately to pick up the check. (*Id.*) Around 10:45 a.m., after leaving the UBA office, [Defendant] picked up two checks from Morgan Keegan totaling just over $124,000. (*Id.*)

[Defendant] then called a personal friend, "E.C.," and told her that he needed to meet with her right away. (Id. at PageID#: 855.) [Defendant] and his wife came over to her house, and [Defendant] told her that there had been "a big misunderstanding" and that his assets had been frozen. (*Id.*) He assured E.C. that the "misunderstanding" would be cleared up shortly and his assets would be unfrozen, but asked in the meantime if he could deposit some checks into her account, so that he could access the money. (*Id.*) He did not tell her anything about there being a court order, or about his company being taken into receivership. (*Id.*) She agreed to [Defendant's] request, and he followed her to her bank and deposited roughly $528,000 in checks into her account. (*Id.*) [Defendant] later asked E.C. to open a new account that would be solely for his money and to provide him with a checkbook. (*Id.*) E.C. agreed to do so, and [Defendant] successfully withdrew roughly $8,000 from that account, despite the asset freeze. (*Id.*)

When the Honorable John T. Nixon, who was presiding over the FTC case, learned of the "willful and flagrant violations of the asset-freeze ordered by this Court as part of the Temporary Restraining Order," he held [Defendant] and his wife in contempt and referred the matter to the U.S. Attorney's Office for further consideration. (DE# 198, Govt. Sentencing Mem., PageID#: 719 (citing *FTC v. United Benefits, LLC*, M.D. Tenn. Case No. 3:10-cv-733, Doc. No. 30); DE# 220, PSR, PageID#: 855.)

## B. Charges and Guilty Plea

In 2014, [Defendant] and his wife were charged in a fifteen-count indictment with mail fraud, wire fraud, money laundering, and criminal contempt. (DE# 1, Indictment.) In the years that followed, [Defendant] requested and received nine continuances of the trial date. (DE# 135, Order, PageID#: 434-39.)

In 2018, [Defendant] pleaded guilty to one count of mail fraud and one count of criminal contempt, pursuant to a plea agreement. (DE# 211, Plea Petition;

DE# 218, Plea Agreement.) Under the terms of the plea agreement, the parties agreed to jointly recommend a total offense level of 26. (DE# 218, Plea Agreement, PageID#: 835.) The parties further agreed that forfeiture should take the form of a money judgment in the amount of $1.5 million, and that [Defendant] would pay restitution in an amount to be determined by the Court at sentencing. (Id. at PageID#: 836.) In addition, the government agreed to recommend a sentence within the guidelines range associated with an offense level of 26, when combined with the Criminal History Category determined by the Court, and to recommend that the sentences imposed on the fraud count and the contempt count run concurrently with each other. (Id. at PageID#: 835.)

## C. Sentencing and Extension of Surrender Date

In preparation for sentencing, the Probation Office prepared a PSR that found [Defendant] to have a total offense level of 30, or four levels higher than what was contemplated in the plea agreement. (DE# 220, PSR, PageID#: 858.) Part of the difference between the PSR and the plea agreement was that the former (unlike the latter) had assessed a two-level enhancement for obstruction of justice on the basis of the contempt conviction. (Id. at PageID#: 858.) The PSR also determined that [Defendant's] fraud offense had involved at least 484 victims and a total loss of more than $3.3 million. (Id. at PageID#: 855.)

Shortly before sentencing, [Defendant] moved to continue the hearing. (DE# 177, Motion.) Although [Defendant] did not initially specify how much additional time he was seeking, correspondence revealed that he sought an extra six months. (DE# 191, Govt. Response, PageID#: 692.) [Defendant] explained that he wanted the extra time to assess his options for treatment of a rectal gastrointestinal stromal tumor, which he had been diagnosed with roughly three years earlier. (DE# 177, Motion, PageID#: 544-47.) The government opposed the request and filed its own sealed motion to revoke [Defendant's] conditions of release pending sentencing, in light of new information that had recently come to light regarding [Defendant's] risk of flight. (DE# 179, Sealed Motion.)

In light of these dueling motions, the district court held a hearing on June 25, 2018, which turned out to be the first part of a bifurcated sentencing hearing. (DE# 242, Sentencing Tr. Vol. I.) At that hearing, the government put on testimony and supporting documentation from Jane Sixsmith, who was a former friend and roommate of [Defendant's]. (Id. at PageID#: 993-1058.) Ms. Sixsmith testified that she had met [Defendant] in the spring of 2017 and had briefly dated him before letting him move into a house that she owned. (Id. at PageID#: 994-97.) She explained that [Defendant] lived a lavish lifestyle, dining at expensive restaurants and traveling frequently to places like Cuba, Miami, Palm Beach, and Fire Island. (Id. at PageID#: 997-1000, 1059-61.) She also described how she had lent him her credit card with the understanding that he would use it only for business related emergencies. (Id. at PageID#: 1003, 1006-14.) Nevertheless, [Defendant] had used

the card for personal expenses, including flights, hotels, clothes, and expensive meals such as a $1,283 lunch at Café Boulud in Palm Beach. (Id.)

Ms. Sixsmith also described how [Defendant] had told her about his plan to avoid prison. She described how he had set aside a large amount of cash; how he had planned to use his illness as a "get-out-of-jail card," including by taking steps to change his appearance for the sentencing hearing to make himself look older and more sickly than he normally looked; and how he would either flee the country or "go out shooting" before being taken into custody. (Id. at PageID#: 1004-22.)

At the end of the hearing, Judge Lawson concluded that it had "heard enough . . . information and documentary evidence to raise significant concern about whether or not the defendant qualifies for release pending sentencing under" 18 U.S.C. § 3143(a). (Id. at PageID#: 1064.) The Court therefore ordered [Defendant] to surrender his passport and put him on electronic monitoring until the sentencing hearing resumed on July 2, 2018. (Id. at PageID#: 1065-67.)

When the sentencing hearing resumed, the Court first conducted an in-depth inquiry into [Defendant's] medical condition. (DE# 243, Sentencing Tr. Vol. II, PageID#: 1071-80.) As the Court made clear, it had carefully reviewed and considered [Defendant's] medical records, and was well aware of his condition, his treatment history, and the options he was considering. (Id. at PageID#:1080-82.) The Court ultimately decided to deny [Defendant's] request to continue the sentencing hearing, but explained that, after imposing sentence, it would "delay the report date for approximately 90 days" to allow [Defendant] to explore further treatment options. (Id. at PageID#: 1082-83.)

As for sentencing itself, the Court granted [Defendant's] objections to the PSR and found a total offense level of 26, as the parties had contemplated in the plea agreement. (Id. at 1085-96.) When combined with a Criminal History Category of I, this yielded an advisory guidelines range of 63 to 78 months. (Id. at PageID#: 1096.)

After hearing testimony from a U.S. Postal Inspector and allocution and argument from the parties, the Court imposed a sentence of 66 months' imprisonment, which it structured as 36months on the fraud count, followed by 30 months on the contempt count. (Id. at PageID#: 1149-50.) As the Court explained, the conduct underlying the fraud offense was serious because [Defendant] "sought to profit based on misrepresentations made to people who were in a particularly vulnerable state," including "individuals who were seeking medical insurance to protect themselves against life catastrophes, some of which came to bear and they were left unprotected." (Id. at PageID#:1146-47.) The Court further observed that Ms. Sixsmith's testimony had "a ring of truth to it, particularly as supplemented by documentation," and it showed that [Defendant] "had not been chastened by his plea of guilt, by the investigation, by the lengthy prosecution in this case, but sought to continue a style along the way of conduct that tended to take advantage using his

gifts of persuasion and frank misrepresentation to promote and commit further misdeeds." (*Id.* at PageID#: 1147-49.) With regard to the contempt offense, the Court explained that it "is a crime that is systemically corrosive," involving "the willful failure" to abide by a court order. (*Id.* at PageID#: 1149.) Given the independent significance of the contempt offense, the court "t[ook] issue" with the portion of the plea agreement that called for the sentences on both counts to run concurrently. (*Id.* at PageID#: 11545.) In the Court's view, "the conduct involved in the criminal contempt count and the conviction for that count is something that is largely different and needs to be addressed on its own." (*Id.* at PageID#: 1145-46.) The Court also ordered forfeiture of $1.5 million and restitution of just over $2.5 million. (*Id.* at PageID#: 1150.) After imposing sentence, the Court gave [Defendant] until October 1, 2018 to self-report, in order to allow him to explore additional treatment options for his cancer. (*Id.* at PageID#: 1155.) The Court later extended the report date several times, until March 18, 2019, but refused to grant the additional five-year extension that [Defendant] requested. (DE# 240, Sealed Order; DE# 276, Order; DE# 280, Order; DE# 281, Order; DE# 284, Order.)

### D. Direct Appeal

[Defendant] appealed, arguing that his sentence was substantively unreasonable, largely on the grounds that the Court had purportedly failed to give sufficient weight to the fact that he is suffering from GIST. The Sixth Circuit rejected that argument and affirmed. *United States v. Thomas*, 782 F. App'x 390 (6th Cir. 2019). After recounting Judge Lawson's extensive consideration of [Defendant's] cancer—both at sentencing and when extending his surrender date—the Court explained, "[n]ot only did the district court consider [Defendant's] medical condition, then, [Defendant] also significantly benefited from that consideration." *Id.* at 394. Given the seriousness of the offense conduct, and the evidence showing that "[Defendant] continued to engage in 'frank misrepresentation to promote and commit further misdeeds,' even well after having been indicted," the Court found that the 66-month sentence was not an abuse of discretion. Id. at 394-95 (quoting Judge Lawson's comments at sentencing).

### E. Service of Sentence and Administrative Requests for Compassionate Release

[Defendant] began serving his sentence in March 2019. Although he initially reported to FCI Butner, he was soon transferred to FCI Miami, to allow him to continue participating in a clinical trial at the Sylvester Comprehensive Medical Center at the University of Miami, which he had enrolled in several months earlier. (See Ex. 1, [Defendant] Compassionate Release Packet, pp. 6-12.) In late July 2019, the drug that [Defendant] was taking through the clinical trial lost its efficacy, and [Defendant's] tumor began increasing in size. (*Id.* at p. 6.) He was then removed from the clinical trial and put onto another form of oral chemotherapy.

On October 10, 2019, [Defendant] sent a letter (with supporting attachments) to the Warden at FCI Miami, requesting compassionate release on the basis of his cancer. (*Id*. at pp. 1-36.) As he stated in the letter, he believed that he had only 10-15 months to live and wanted to "spend some time with my family and friends, while I search for a cure for my cancer," which "probably will take me traveling to other countries seeking out alternative forms of treatment." (*Id*. at p. 2.)

Three weeks later, on October 31, 2019, the U.S. Probation Office in this district sent a letter to a case worker at FCI Miami, reporting that the officers had evaluated the home of [Defendant's] son, Joshua Thomas, in Portland, Tennessee, and found it suitable for [Defendant] to live in if released. (Ex. 2, USPO Memo re Release to Joshua Thomas.)

On November 8, 2019, Dr. Inerio Alarcon, the clinical director at FCI Miami, sent a memorandum to the warden at FCI Miami addressing [Defendant's] medical condition. (Ex. 3, Alarcon Memo.) Dr. Alarcon reviewed the history of [Defendant's] cancer, including the fact that, when [Defendant] was diagnosed in 2015, "his doctor recommended surgery to remove the tumor but [Defendant] opted to treat his cancer with chemotherapy instead of surgery." (*Id*. at p. 1; see also id. at p. 3 (noting that [Defendant] "refused the surgical intervention pathway which would have increased his overall survival rate to an indeterminate amount of time").) Dr. Alarcon observed that [Defendant] "has persistent and chronic medical conditions that require frequent evaluation and monitoring with multiple medical teams in order to control and avoid further complications, including death." (Id. at p. 2.) Dr. Alarcon further observed that while [Defendant's] medical condition was stable "[a]t the present time," and that "his medical needs are adequately managed at FCI Miami," the treating oncologist had projected that [Defendant] had "less than 18 months" to live. (*Id*.) And although Dr. Alarcon had not received the records he needed to independently confirm this prognosis, he "speculat[ed] that the 18 month life expectancy interval provided by the Oncologist" was likely accurate. (*Id*.) In light of these observations, recommended that [Defendant] "be considered for a reduction in sentence at this time." (*Id*. at p. 3.)

That same day, November 8, 2019, the Compassionate Release Request Committee (which included Dr. Alarcon) met to consider [Defendant's] request. (Ex. 4, Committee Meeting Minutes.) The minutes reflect that because the medical assessment had found that "[Defendant] meets the criteria for Terminal Medical Condition[,] . . . the committee will forward the case for the Warden's review with a recommendation of approval." (*Id*. at p. 3.) The committee also noted, however, that [Defendant's] release would "minimize the severity of the offense," given that there were "[a]t least 484 victims" and "he has only served 11.8% of his sentence." (*Id*.)

On November 22, 2019, Dr. Jeffrey Allen sent a memorandum to Zachary Kelton, associate general counsel for BOP assessing [Defendant's] medical condition. (Ex. 5, Allen Memorandum.) Dr. Allen reviewed [Defendant's] medical

history, noting again that [Defendant] had twice—in 2015 and again in 2017—refused a surgical intervention that could have eliminated his cancer. (*Id.* at p. 1.) Dr. Allen noted that [Defendant's] "prognosis is considered poor with a life expectancy of 10 to 15 months," and that he "is pending transfer to FMC Butner for in-house oncology services and additional medical support." (*Id.* at p. 2.) Dr. Allen concluded that [Defendant] "does meet the BOP terminal RIS criteria based on a life expectancy that is less than 18 months. Although [Defendant] could live more than 18 months, the rectal gastrointestinal stromal tumor is likely to result in his death, and therefore, is likely to be associated with an end-of-life trajectory as described in the First Step Act." (*Id.* at p. 2.) Four days later, on November 26, 2019, [Defendant] was transferred to FMC Butner.

While not entirely clear from the record, it appears that at some point after October 31, 2019, [Defendant] modified his release plan and proposed to live with a Mr. Restrepo in Dallas, Texas, rather than with Joshua Thomas in Portland, Tennessee. On December 19, 2020, the U.S. Probation Office in the Northern District of Texas submitted a letter stating that they had spoken to Mr. Restrepo, who "indicated he did not want [Defendant] residing with him at this time." (Ex. 6, USPO Letter re Release to Restrepo.) The letter also noted that [Defendant] "currently has no ties to the Northern District of Texas." (*Id.*) As such, [Defendant's] release plan was denied. (*Id.*)

In January 2020, [Defendant] sent two emails to his social worker regarding his release plan. (Ex. 7, Thomas Emails re Release Plan.) In the first, from January 22, 2020, [Defendant] said, "I live and work in Dallas. Please cancel the one at my Son's home. I only visit to see him and my grandchildren. I'm in the process of leasing the home I had before I came in." (*Id.* at p. 1.) In the second, from January 24, 2020, [Defendant] said that his release plan now involved living with James Wood in Irving, Texas. (*Id.* p. 2.)

On March 3, 2020, [Defendant's] social worker at FMC Butner signed a Social Work Summary Sheet, as part of the review process for [Defendant's] request for compassionate release. (Ex. 8, Social Work Summary Sheet.) In it, the social worker indicated that James Wood "confirmed that the patient can return to his home if released" and was "prepared to provide support and care to him." (Id. at p. 2.) The social worker concluded, "Based on this information, he has an appropriate release plan if he is approved for RIS and released." (*Id.*) On March 10, 2020, two advocates for [Defendant] from Justice Advocacy Group sent a letter to [Defendant's] social worker to "emphatically stress[] that Mr. James Wood is the residence where [Defendant] plans on residing following release from the BOP." (Ex. 9, Sickler Letter.)

In the intervening weeks, Mr. Wood's willingness to allow [Defendant] to live with him evidently changed (perhaps based on growing concerns about COVID-19). On March 20, 2020, the U.S. Probation Office in the Northern District of Texas submitted a letter stating that Mr. Wood "indicated he did not want

[Defendant] residing with him at this time. Additionally, [Defendant] currently has no ties to the Northern District of Texas." (Ex. 10, USPO Letter re Release to Wood.) [Defendant's] release plan was therefore denied. (*Id.*)

On March 30, 2020, the warden sent [Defendant] a letter formally denying his request for compassionate release. (Ex. 11, Warden Letter to Thomas.) The warden confirmed that [Defendant] is "suffering from a terminal medical condition" and therefore "meet[s] the medical criteria," but noted that his release plan had been denied." (*Id.*)

The same day, [Defendant] sent a letter to his social worker to "provid[e] a different release plan," in which he would live with his son, Joshua Thomas, in Portland, Tennessee. (Ex. 12, Thomas Letter to Social Worker.) (It appears that [Defendant] learned on March 25, five days before the warden's letter, that his release plan had been denied.) [Defendant's] letter also stated, "The Coronavirus has me really afraid because my immune system is compromised by the years of oral chemotherapy. I'm here with approximately 156 men as you know and I could be among the first to go." (*Id.*)

While not entirely clear from the record, it appears that at some point in early to mid-April, a social worker sent [Defendant's] medical records to an oncologist at Butner named Dr. Andres Carden, and asked Dr. Carden to reevaluate whether [Defendant] met the medical criteria for compassionate release. (Ex. 13, Dr. Carden Emails.) On April 15, 2020, Dr. Carden sent an email stating, "No, he has localized controlled disease and refuses treatment for potential cure." (*Id.*) At this point, the undersigned has not seen any additional documentation explaining the basis for Dr. Carden's opinion.

That same day, and evidently as a result of Dr. Carden's reassessment, the warden sent [Defendant] a letter in response to his March 30, 2020 request. (Ex. 14, Warden Letter to Thomas.) The warden noted, "It has been determined that you do not meet the criteria under Terminal Illness at this time." (*Id.*) The warden also noted that [Defendant's] "concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from your sentence." (*Id.*).

On May 6, 2020, [Defendant] submitted an administrative request asking BOP to reconsider its denial. (Ex. 15, Administrative Request and Response, p. 2.) It appears that [Defendant] misunderstood the basis of the BOP's most recent denial, however, as his reconsideration request stated, "Thank you for agreeing that I have a terminal condition with less than 18 months to live." (*Id.*) It appears that he then argued that he should be released even if no specific release plan has been approved. (*Id.*)

The warden sent [Defendant] a response on May 13, 2020, stating, "An inquiry into your request revealed that your RIS was originally denied on March

30, 2020, due to the United States Probation Office deeming your release plan unacceptable. On April 15, 2020, your medical condition was reevaluated and it was determined that you do not meet the criteria under Terminal Illness. Based on the above, your request for administrative remedy is denied." (*Id.* at p. 1.)

On June 3, 2020, [Defendant] tested positive for COVID-19. Based on the medical records, it appears that [Defendant] was asymptomatic before the test, and has remained so since. On July 4, 2020, he was retested, but the results have not been returned as of the date of this filing.

(Doc. No. 296 at 3-20).

## LAW GOVERNING COMPASSIONATE RELEASE MOTIONS

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the Section 603(b)(1) First Step Act of 2018, P.L. 115-391, 132 Stat. 5239,[1] the district court may under certain circumstances grant a defendant's motion for compassionate release[2] if what the Court will call the "exhaustion requirements" have been satisfied—*i.e.*, "[either] the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons [("BOP")] to bring a motion [for compassionate release] on the defendant's behalf or [there has been a] lapse of 30 days since the

---

[1] That paragraph of Section 603 provides:

(b) INCREASING THE USE AND TRANSPARENCY OF COMPASSIONATE RELEASE.—Section 3582 of title 18, United States Code, is amended—
　　(1) in subsection (c)(1)(A), in the matter preceding clause (i), by inserting after ''Bureau of Prisons,'' the following: ''or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . .''

[2] A motion under Section 3582(c)(1)(A) is actually a motion for a reduction in sentence, including but not limited to reductions that would result in the defendant-movant's immediate release. The grant of a motion for sentence *reduction* under Section 3582(c)(1)(A) would not necessarily result in the defendant's immediate *release*. *See United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *8 (D. Utah Feb. 18, 2020) (quoting *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391 at *4 (D. Neb. Nov. 14, 2019)). Nevertheless, such motions generally are known as ones for "compassionate release." *Id.* at n.2 ("In this order, the court uses the phrase 'compassionate release' and 'sentence modification' interchangeably, which is consistent with how other courts have used the terms."); *United States v. McDonald*, No. 94-CR-20256-1, 2020 WL 3166741, at *1 (W.D. Tenn. June 8, 2020). This reflects the fact they typically do seek immediate release rather than a mere reduction in sentence that would result in an earlier release someday but not immediately.

receipt of such a request [for BOP to file such a motion] by the warden of the defendant's facility, whichever is earlier." Once it properly can act on a motion brought under 18 U.S.C. § 3582(c)(1)(A), the district court can reduce a sentence under that provision (for any defendant younger than 70 years old)[3] only if it finds extraordinary and compelling reasons to do so. *See* 18 U.S.C. § 3582(c)(1)(A)(i). The defendant bears the burden of showing that "extraordinary and compelling reasons" exist to justify release under the statute. *United States v. Hayward*, No. CR 17-20515, 2020 WL 3265358, at *1 (E.D. Mich. June 17, 2020). And the Court does not write on a clean slate in considering what qualifies as "extraordinary and compelling reasons."

Congress tasked the Sentencing Commission with promulgating "general policy statements regarding . . . the appropriate use of . . . the sentence modification provisions set forth in [section] 3582(c) of title 18. . . ." 28 U.S.C. § 994(a)(2)(C). Congress directed the Sentencing Commission, in promulgating these policy statements, to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In response to these congressional instructions, the Sentencing Commission promulgated U.S.S.G. § 1B1.13, and its application note, which collectively comprise the policy statement(s).

Practitioners of federal criminal law are accustomed to treating the Sentencing Commission's policy statements as advisory only (especially in the aftermath of *United States v. Booker*, 543 U.S. 220 (2005)). They are exactly that in the context of a defendant's original sentencing—but not in the context of a motion under Section 3582(c)(1)(A). In the latter context, they are by statute mandatory, inasmuch as Congress has prohibited courts from granting a

---

[3] This subparagraph provides an alternative ground for relief for defendants who are at least 70 years of age. *See* 18 U.S.C. § 3582(c)(1)(A). It is inapplicable here, however, because Defendant is only 58.

sentencing reduction unless "such a reduction is consistent with applicable policy statements issued by" the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A).[4]

Together, U.S.S.G. § 1B1.13 and its application note do two things that are relevant here. First, they define, in Application Note 1, "extraordinary and compelling circumstances" to apply in (and only in) situations falling within one or more of five separate and particular categories, which the Court discusses below. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(i)-(ii), (B), (C) & (D).[5] Second, they prescribe additional requirements for obtaining a sentence reduction where the defendant does meet the threshold requirement of "extraordinary and compelling circumstances."[6] Specifically, for a defendant not yet 70 years old (such as Defendant), the court may reduce a sentence if (1) extraordinary and compelling reasons warrant a reduction, *and* (2) the defendant is not a danger to the safety of any other person or to the community, *and* (3) the reduction is consistent with the policy statement. *See* U.S.S.G. § 1B1.13(1)(A), (2) and (3). The Application Note indicates the third requirement may be redundant of the first two, inasmuch as it states that "any reduction made . . . for the reasons set forth in subdivisions (1) and (2) [*i.e.*, U.S.S.G. § 1B1.13(1) & (2)] is consistent with this policy statement." *Id.* at n.5.[7]

---

[4] In *Booker*, the Supreme Court found unconstitutional (*i.e.*, violative of the Sixth Amendment) Congress's directive that the Sentencing Guidelines are generally what was referred to as "mandatory," meaning that sentence generally had to be imposed within the guideline range calculated using the Sentencing Guidelines. To say the least, this limited Congress's ability to make anything about the Sentencing Guidelines mandatory in the context of an original sentencing. But such limitations do not exists in the context of a motion for sentence reduction under Section 3582(c)(1)(A), wherein the Sixth Amendment concerns driving the *Booker* decision are entirely absent.

[5] The Application Note also contains various other instructions for considering whether extraordinary and compelling circumstances exist. Such instructions need not be discussed here, as they do not affect the Court's resolution of the Motion.

[6] It is worth noting that these other requirements—being, after all, *requirements*—are mandatory. That is to say, a defendant is *not* eligible for compassionate release merely because there are "extraordinary and compelling reasons" within the meaning of Application Note 1.

[7] Like many redundancies, this one may seem odd due to its apparent unnecessariness. But it seems motivated by the valid desire to ensure that the Sentencing Commission's criteria for a sentencing reduction expressly both: (a)

If the court does find these (two or three depending on how one looks at it) requirements satisfied, the defendant has met the basic eligibility for compassionate release. But even then, the Court does not automatically or necessarily grant the motion for a reduction; instead, it *may*, after considering the factors set forth in 18 U.S.C. § 3553(a), reduce the term of imprisonment (and may impose a term of probation or supervised release that does not exceed the unserved portion of the original term of imprisonment). *See* 18 U.S.C. § 3582(c)(1)(A).

As discussed above, the Sentencing Commission has issued a binding policy statement regarding reduction of a term of imprisonment under Section 3582(c)(1)(A). *See* U.S.S.G. § 1B1.13. As further mentioned above, Application Note 1 to U.S.S.G. § 1B1.13 speaks to what constitutes "extraordinary and compelling reasons," identifying five categories of situations where such reasons may be found to exist. Two of the five involve the defendant's medical condition, *i.e.*: (i) the defendant is suffering from a terminal illness, *see* U.S.S.G. § 1B1.13 cmt. n.1(A)(i); or (ii) the defendant is suffering from a serious physical or medical condition, *see* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), or serious functional or cognitive impairment, *see* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(II), or deteriorating physical or mental health due to the ageing process, U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(III), that substantially diminishes the defendant's ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover. The next two categories relate to defendants over 65 and defendants with particular grave family circumstances, respectively; they are not applicable to the instant Motion.

As for the last of the five categories (sometimes referred to as the "catchall" category) the Application Note describes it as encompassing the situation where, "[a]s determined by the

---

included the congressional requirement, discussed below, that any reduction be "consistent with applicable policy statements issued by" the Sentencing Commission; and (b) clarified that the required consistency involved nothing more than satisfaction of U.S.S.G. § 1B1.13(1) & (2).

Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D).

## ANALYSIS

Defendant, who currently remains incarcerated at FCI Butner, maintains that his 66-month (currently set to expire on November 21, 2023, according to BOP's searchable online "inmate locator," https://www.bop.gov/inmateloc), should be modified pursuant to 18 U.S.C. § 3582(c)(1)(A). Initially, he suggested that upon release he be placed on home confinement to serve the remainder of his sentence. (Doc. No. 287 at 8). Later, in a letter to the Court, he indicated that a reduction of his sentence to time served was the more appropriate option for him. (Doc. No. 299). Whether the Court will grant Defendant the relief he seeks will be explored below.

### I. EXTRAORDINARY AND COMPELLING REASONS

As explained above, the Application Notes to § 1B1.13 state that when a defendant suffers from a medical condition, extraordinary and compelling reasons exist in two scenarios: the medical condition (1) is a terminal illness or (2) "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13 n.1(A)(i)–(ii). It is not completely clear from Defendant's filings which of these two categories he relies on as "extraordinary and compelling reasons" to warrant compassionate release. In his initially filed Emergency Motion for Sentence Reduction, (Doc. No. 287), Defendant asserts that he should be granted a reduction of his 66-month sentence due to his compromised immune system (as a result of years of oral chemotherapy), which allegedly places him at a heightened risk of an adverse outcome should he contract COVID-19. Thus, in so arguing, Defendant relies on the second above-mentioned category by asserting that

he suffers from a serious medical condition that substantially diminishes the defendant's ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover. The Government takes the position that this category is the basis for Defendant's Motion. (Doc. No. 296 at 1).

In other filings, however, Defendant seems to rely on the first of the above-mentioned categories—*i.e.*, that he is suffering from a terminal illness—to show extraordinary and compelling reasons. For example, in one of his numerous (*pro se*) filings, Defendant states that he "meets the threshold requirement of 'extraordinary and compelling reasons' because he is suffering from a terminal form of cancer with a life expectancy of less than 18 months." (Doc. No. 298 at 6). As it is not completely clear which category Defendant is relying on, out of an abundance of caution, the Court will proceed as if Defendant is relying on both as grounds to demonstrate extraordinary and compelling reasons for compassionate release.[8]

In order for compassionate release to be warranted under the "terminal illness" category, a court must find that:

> the defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

U.S.S.G. § 1B1.13 cmt. n.(1)(A)(i). As discussed above, Defendant has the burden to demonstrate that he is suffering from a terminal illness. *See Hayward*, 2020 WL 3265358, at *1.

As explained above, Dr. Alarcon, the Clinical Director at FCI Miami where Defendant underwent treatment, indicated in a 2019 memorandum addressed to the warden of FCI Miami

---

[8] Whether the "extraordinary and compelling reasons" are based on a terminal illness or instead on a medical condition that diminishes Defendant's ability to provide self-care matters here, because if the Court were to determine that Defendant is suffering from a terminal illness, it would affect its analysis of the Section 3553(a) factors, as well as its analysis regarding the danger Defendant poses to other persons and the community.

that Defendant's treating physician had opined that Defendant had "less than 18 months" to live. (*See* Doc. No. 296-3). And although Dr. Alarcon had not received the medical records he needed to independently confirm this prognosis, he "speculat[ed] that the 18 month life expectancy interval provided by the Oncologist" was likely accurate. (*Id*.) In light of these observations, Dr. Alarcon recommended to the warden that Defendant "be considered for a reduction in sentence at this time" in light of his "terminal" illness. (*Id*. at 3).

Nevertheless, in its response, the Government disputes that Defendant's cancer—in its current state—is a terminal illness within the meaning of U.S.S.G. § 1B1.13 cmt. n.(1)(A)(i). (Doc. No. 304 at 3). In support, the Government relies on the declaration of Dr. Andrew Stock, the Clinical Director at FMC Butner (where, as noted, Defendant is now incarcerated); therein Dr. Stock explains that in January 2020, Defendant underwent a pelvic MRI, which revealed that Defendant's tumor had shrunk from 9 cm in October 2019 to 6.5 cm at the time of the scan. (Doc. No. 304 at ¶ 12). Thus, in January 2020, Defendant's treating oncologist at FCC Butner recommended surgery to remove the tumor and further reported that Defendant's "disease was stable with no evidence of distant metastatic disease or adenopathy." (*Id*. at ¶¶ 12, 13).[9] Defendant informed the treating oncologist that he was not interested in undergoing surgery to remove the tumor. (*Id*. at ¶ 13). Thus, Dr. Stock explained that

> Per the FCC Butner oncologist, [Defendant's] prognosis is mostly poor because he is currently refusing a treatment option that can potentially cure him. If he agreed to have the recommended surgery, which is the standard of care, he could potentially be cured. By refusing surgery, his cancer at some point will likely grow and spread, which would make surgery and cure not possible.

---

[9] On April 15, 2020, the warden of FCI Butner denied Defendant's request for compassionate release based on the fact that Defendant's "medical condition was reevaluated and it was determined that [he did] not meet the criteria under Terminal Illness." (Doc. No. 296-15 at 1).

(*Id.* at ¶ 17). Defendant has since remained on his current oral chemotherapy treatment. (*Id.* at ¶ 16). Although Defendant is scheduled for another CT scan, Defendant has been unable to obtain further imaging since January 2020, due to modified operations at FCC Butner as a result of COVID-19. (*Id.*).

Based on the current record evidence, the Court cannot conclude that Defendant has met his burden to demonstrate that his illness is *currently* terminal. By this statement the Court certainly does not mean to belittle the gravity of Defendant's cancer. However, the Court finds it to be good news that the latest imagining studies reveal that Defendant's tumor is shrinking, and further tests confirm that the cancer has not metalized. (*Id.*). Moreover, the tumor no longer appears to be inoperable and Dr. Stock states that Defendant "could potentially be cured" if he agreed to surgery. (*Id.* at ¶ 17); *see also United States v. Goode*, No. 14-810, 2020 WL 58272, at *2, 6 (S.D.N.Y. Jan. 6, 2020) (stating that "defendant's medical situation, debilitated though she be, does not reach the level at which BOP Guidelines suggest consideration for compassionate release"). Accordingly, Defendant has not met his burden to show that he has a "terminal illness" within the meaning of Application Note 1(A)(i).

However, the Court is cognizant of the fact that due to restrictions related to the COVID-19 pandemic, Defendant has not undergone a CT scan or any other imaging study since January 2020. So it is currently unknown whether Defendant's tumor has grown, shrunk, or stayed the same in the seven months since that time. Although the Court finds on the current record that Defendant has not demonstrated that he is suffering from a terminal illness, if Defendant's illness was to take an unfortunate turn for the worse, becoming truly terminal, Defendant may refile a motion for compassionate release. In that event, the Court would analyze the Section 3553, and assess the danger Defendant poses to the community in the context of the updated situation.

Finding that Defendant's illness is not terminal, the Court turns to Defendant's assertion that his cancer constitutes extraordinary and compelling reasons because it places him at an increased risk of severe illness should he contract COVID-19. Initially, the Government did not concede that Defendant's cancer combined with the risk of an COVID-19 infection amounted to extraordinary and compelling reasons. (Doc. No. 296). However, the Government now concedes this point, explaining that:

> On July 17, 2020, [] the CDC updated its list of those who "*are* at an increased risk" to include people with cancer. Because [Defendant] has cancer, and because cancer is now listed as a confirmed CDC risk factor, the government concedes that [Defendant] "is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," [cite], and has therefore demonstrated extraordinary and compelling reasons.

(Doc. No. 304 at 4). Based on this concession, the Court finds that Defendant has shown "extraordinary and compelling reasons" under U.S.S.G. § 1B1.13 cmt. app. n. 1(A)(ii)(I) and thus is eligible for further consideration for compassionate release as it relates to his cancer and the associated risks posed by the COVID-19 pandemic.

## II. DANGER TO OTHER PERSONS OR THE COMMUNITY

As noted above, Defendant can be eligible for compassionate release, such that the Court proceeds to an analysis of the factors under 18 U.S.C. § 3553(a), only if he is not a danger to other persons or the community. *See* U.S.S.G. § 1B1.13. The Court generally perceives the precise issue to be whether Defendant would pose such a danger if released (and not whether he currently poses a danger while incarcerated). "[T]he defendant has the burden of proof on the issue of his lack of danger to others and the community." *See United States v. Rodriguez*, No. 3:95CR772, 2020 WL 3260711, at *1 (N.D. Ohio June 13, 2020).

Defendant argues that he "does not pose a danger or risk to the community." (Doc. No. 298 at 7). Although he does not provide further explanation, in consideration of his *pro se* status, the Court construes additional statements in Defendant's filings as intended to support that he is not a danger to the community. For example, Defendant highlights his lack of criminal history by arguing that he "has owned businesses for 36 years and has never had any problems with any of them prior to UBA." (Doc. No. 301 at 13). He further attempts to downplay the significance of his criminal activity by asserting that his

> company had over 100,000 plans on the books. The government states 484 of the 100,000 have had financial issues due to purchasing a plan from UBA in which I'm deeply sorry if that number is correct [Defendant's] numbers are much lower than 484. But let's say it is 484, that would mean 99.095% of UBA's customers are happy. Unhappy people do not pay every month if they are not happy.

(Doc. No. 301 at 15). He also contends that he is a "model inmate." (Doc. No. 306). The Court construes these assertions as arguments that Defendant is not a danger to the community because (1) he does not have a criminal history (outside of his current offenses); (2) the crime he was convicted of was not truly "dangerous," because only a small percentage of his clients were defrauded; and (3) he is a model inmate.

The Government argues that Defendant would pose a danger to the community if released. It asserts that while Defendant was not charged with a violent crime, "danger to the community under the Bail Reform Act is construed more broadly than mere concerns of potential physical violence. It also encompasses potential pecuniary or economic harm." (Doc. No. 304 at 7 (quoting *United States v. Ali*, No. 2:16-cr-20667, 2019 WL 7586530, at *3 (E.D. Mich. Oct. 4, 2019) (citations and internal quotation marks omitted))). And the Government asserts that Defendant does pose a danger in the form of economic harm to the community because:

> [Defendant] engaged in a multi-year fraud scheme involving hundreds of victims. During the scheme itself, [Defendant] took numerous steps to cover up, and persist

in, the fraudulent conduct even after it had been detected: for example, he regularly changed the company's name, falsely named his wife the nominal CEO, and tried to dupe the Better Business Bureau into thinking there was no connection between one iteration of the company and another. Even after the FTC shut the company down and froze [Defendant's] assets, he duped a friend into depositing hundreds of thousands of dollars into her own account (and later opening a separate account in his name) so that he would still have access to his ill-gotten gains. Perhaps most importantly, Judge Lawson heard testimony about how [Defendant] had continued to take advantage of others and live lavishly while awaiting trial and sentencing, prompting him to find that [Defendant] had not been "chastened by his plea of guilt, by the investigation, [or] by the lengthy prosecution in this case, but [instead had] sought to continue a style along the way of conduct that tended to take advantage using his gifts of persuasion and frank misrepresentation to promote and commit further misdeeds." (DE# 243, Sentencing Tr. Vol. II, PageID#: 1147-49.)

(*Id*. at 7). The Government argues that these circumstances make it "difficult to conclude that [Defendant] would not attempt to engage in additional fraudulent conduct if he were released, making him a continued danger to the public." (*Id*.).

The Court finds that Defendant has not met his burden to demonstrate that he would not be a danger to the community if he were released. To begin, the Court agrees with the Government that an individual does not have to be considered violent, or be convicted of a violent crime, to be considered a danger to the community. Numerous other courts in determining motions for compassionate release have found that defendants considered to be solely "white collar" offenders did in fact pose a danger to the community. *See United States v. Hill*, No. CR 18-271, 2020 WL 4431530, at *7 (E.D. Pa. July 31, 2020); *United States v. Williams*, No. 18-483, 2020 WL 3577411, at *5 (D. Md. July 1, 2020); *United States v. Burman*, No. 16 Cr. 190, 2020 WL 3182766, at *5 (S.D.N.Y. June 13, 2020) (denying compassionate release to defendant who committed several fraud-related offenses, because he remained a danger to the community). Here, Defendant engaged in an extensive fraudulent scheme that involved hundreds of victims. *See United States v. Meli*, No. 17-CR-127 (KMW), 2020 WL 2114769, at *2 (S.D.N.Y. May 4, 2020) (finding that released the "[d]efendant would be contrary to the Sentencing Commission's directive that courts should

deny compassionate release to defendants who pose a danger to their communities [because the d]efendant's fraud scheme lasted over a year and caused grave financial and emotional harm to his many victims."). If Defendant were to undertake the same or similar course of conduct, it would certainly pose a danger to the community. And although Defendant apparently does not consider his fraud to be egregious in light of the fact that, by his calculations, 99.095% of UBA's customers were not victims of his fraudulent scheme, (Doc. No. 301 at 15), the Court is loath to consider a fraud scheme that caused financial harm to nearly 500 victims to be too insignificant to be a dangerous crime. No doubt things would be worse if the percentage of his victimized customers had been higher, and the fact that it was not likely helped Defendant avoid a higher sentence than what he received.[10] But it does not get him far in his attempt to show that he would not be a danger if released.

Additionally, despite not having a significant criminal history, Defendant's conduct while awaiting trial and sentencing in this case does not endow the Court with confidence that Defendant will not recidivate. Even after the "jig was up," so to speak, Defendant went through considerable effort to enjoy his ill-gotten gains, resulting in a criminal conviction for contempt of court. And when those assets were no longer available, he moved on to taking advantage of others in a way Judge Lawson referred to at sentencing as "continu[ing] a style along the way of conduct that tended to take advantage using his gifts of persuasion and frank misrepresentation to promote and commit further misdeeds." (Doc. No. 243 at 79-81).

In addition, Defendant has made it very apparent to this Court that he intends to continue maintaining "clients" and conducting a business in Dallas, Texas, if he were to be released. Together, these circumstances make the Court unwilling to say he would not be a danger to the

---

[10] The undersigned did not preside over this case at any time until long after sentencing and entry of final judgment.

community. Defendant wrote to the Court to clarify that although he would reside with his son in Portland, Tennessee upon his release, he would soon need to get back to Texas "[s]ince [his] company is in Dallas [and thus his] clients are as well." (Doc. No. 303 at 2). Under these circumstances, Defendant's release plan does not suggest that it would adequately reduce Defendant's risk of danger to others or the community.

Finally, the fact Defendant considers himself a "model inmate" is barely probative of whether he will cause more crime. *See United States v. Genovese*, No. 18CR183, 2020 WL 4004164, at *4 (S.D.N.Y. July 15, 2020) (explaining that "it would strain credulity to conclude that Genovese [who was convicted of wire fraud] is no longer a danger to the community merely because—as Genovese submits—he has exhibited good behavior while incarcerated[.]"). Certainly, being a model inmate is a good thing generally, and it absolutely beats the alternative for someone bearing Defendant's burden on lack of danger. However, especially when the particular danger posed by the defendant is the kind of "white collar" danger posed by Defendant as outlined above, the danger at issue is not shown to be materially reduced by the defendant's ability to be compliant inside prison walls. Accordingly, the Court finds that Defendant would pose a danger to the community if he were released, thus dooming his Motion.

III. SECTION 3553(a) FACTORS

Although Defendant does not qualify for compassionate release, irrespective of how the Section 3553(a) factors apply to him, the Court will discuss the most salient Section 3553(a) factors, which collectively cut against granting compassionate release for him.

*The nature and circumstances of the offense* cut against compassionate release. As discussed in detail above, Defendant orchestrated a fraud scheme that inflicted considerable economic harm on nearly 500 victims. And Defendant took affirmative steps to cover up and

continue the fraudulent conduct even after it had been detected, which lead to a contempt of court conviction. For those same reasons, *the history and characteristics of the Defendant* also cut against compassionate release. As discussed above, although Defendant does not have an extensive criminal history, his conduct pending trial and sentencing in this case was described by Judge Lawson as "continu[ing] a style along the way of conduct that tended to take advantage using his gifts of persuasion and frank misrepresentation to promote and commit further misdeeds." (Doc. No. 243 at 79-81). Also for the same reason and to the same extent, and for the reasons discussed above in connection with whether Defendant would be a danger if released, *the need to protect the public from further crimes of the defendant* also cuts against Defendant.

   *The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner* likewise does not cut in favor of compassionate release for Defendant. The focus in this case, as discussed above, is that Defendant's cancer places him at a heightened risk of an adverse outcome from COVID-19.

   The Court will not act like it knows the extent to which Defendant's chances of re-infection would be lower if he is released than if he stays in BOP custody.[11] As matter of sheer epistemology, the undersigned cannot and does not know such things; this is true despite publicly available information from medical experts and public health officials, inasmuch as they do not always agree with one another on issues related to COVID-19 and inasmuch as some seem to have reversed

---

[11] The Government argues that because Defendant has already been infected with COVID-19, and suffered no symptoms, "it appears that the valid concerns motivating [Defendant's] motion have, fortunately, not come to pass." (Doc. No. 304 at 5). While recognizing that other courts have found that a prior COVID-19 infection weighs against granting a motion for compassionate released based on COVID-19 grounds, (*see id.*), the undersigned finds that this fact weighs neither for nor against granting compassionate release. As the Government itself points out, "there is not yet any scientific consensus about the likelihood of reinfection after recovery." *Id*. The Court will not deny compassionate release based on sheer speculation that reinfection is not likely to occur. Thus, the fact that Defendant has already been infected with COVID-19 does not affect the Court's analysis.

themselves on various issues over time.[12] In short, information and opinions regarding the prevalence of, effect of, and optimal countermeasures to COVID-19 have been in constant flux, and it would be folly for the Court to rely blindly on any particular opinion or factual assertion merely because it comes from a purportedly knowledgeable or reputable source.

Having said that, the Court is also willing to accept that Defendant's medical conditions make him prone to relatively bad outcomes in case of infection; despite that Defendant has already had an asymptomatic COVID-19 infection. This stance is, of course, consistent with the Court's finding above that there exist "extraordinary and compelling reasons" within the meaning of U.S.S.G. § 1B1.13.

But that does not mean that these circumstances ultimately support compassionate release. For one thing, the Court would merely be speculating as to the extent to the likelihood of a bad outcome upon re-infection. For another thing, to say the least, it is not like there in no substantial risk of infection outside of BOP custody. For example, the Tennessee Department of Health reports, in Sumner County, Tennessee (where Defendant proposes to reside initially if released), 3,501 "confirmed or probable" and 1,277 "active" cases of COVID-19 as of August 12, 2020. *See Epidemiology and Surveillance Data*, Tennessee Dept. of Health, https://www.tn.gov/content/tn/health/cedep/ncov/data.html (last accessed August 12, 2020). And as is also a matter of public record (and undeniable truth in the undersigned's personal experience), these cases have accrued despite substantial steps to keep the infection rate down in Tennessee.

---

[12] It seems clear to the undersigned that certain public health authorities, public health officials, and other public officials over time have equivocated regarding, or even starkly changed, their views concerning one or more of numerous issues, including but not limited to: whether COVID-19 can be transmitted person to person; whether persons should avoid crowds and/or otherwise alter their daily regimen due to the presence of COVID-19 in the United States; the likely death toll and mortality rate from COVID-19; whether masks/face coverings should be worn; and the extent to which COVID-19 may be transmitted via contact with inanimate surfaces.

Given Defendant's history of noncompliance with court orders, not to mention the current offenses of conviction, Defendant has demonstrated to some extent—even if not to the full extent as some defendants—an unwillingness and/or inability to comply with rules and societal norms in at least some important respects. Moreover, Ms. Sixsmith's testimony, which Judge Lawson apparently credited, suggests an disposition in Defendant to be egregiously non-complaint with essential rules and norms.

This is vital, because under his own theory (and the widely-accepted view worldwide), decreasing his risk of infection upon release from BOP custody would require him to observe public/health and societal norms related to COVID-19, such as handwashing and social distancing. Moreover, Defendant has indicated that if he were released, he plans to "travel[] to other countries seeking out alternative forms of treatment." (Doc. No. 296-1). He also plans to travel to Dallas, Texas shortly after released to tend to his business there. (Doc. No. 303). This certainly does not help convince the Court that Defendant is particularly committed to social distancing or otherwise reducing his risk of infection.

For all of these reasons, there is no good basis to believe that Defendant's release is likely *in actuality*—not just theory—to substantially reduce his risk from COVID-19.

Moreover, the requested relief would undermine the need to "*promote respect for the law*," "*afford adequate deterrence to criminal conduct*," and "*avoid unwarranted sentence disparities.*" 18 U.S.C. § 3553(a)(2)(A), (B). It likewise would not square very well with his advisory *guideline range*, which under Section 3553(a) also must be taken into account. 18 U.S.C. § 3553(a)(4)(A). Defendant has only served 16 months of his (within-guideline) 66-month sentence. A de-facto 16-month sentence would represent a dramatic downward variance from Defendant's guideline range at sentencing—63 to 78 months. *See United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir.

2020) (explaining that "the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law permit the court to consider the amount of time served in determining whether a sentence modification is appropriate."). Accordingly, to grant Defendant compassionate release would create an unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct. Additionally, a reduction of the Court's original sentence would also fail to reflect the seriousness of the offense Defendant committed and would not provide a just punishment for his conduct. It would also undermine the Court's attempt to use the sentence to promote respect for the law and serve as a deterrent for criminal conduct.

Thus, the Court finds that the Section 3553(a) factors do not weigh in favor of granting Defendant compassionate release, even if he were not a danger to the community.

CONCLUSION

Compassionate release is an extraordinary remedy. *See*, *e.g.*, *United States v. Rizzo*, No. CR 16-20732, 2020 WL 2092648, at *3 (E.D. Mich. May 1, 2020). Such remedy is unavailable here, given that if released, Defendant has not shown that he would not present a danger to other persons or the community. Alternatively, even if compassionate release were potentially available, it would be inappropriate, considering the Section 3553(a) factors.

For these reasons, the Motion (Doc. No. 287) is **DENIED**.[13]

IT IS SO ORDERED.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[13] To the extent that Defendant's other various filings that the Court construed as supplements to his originally filed motion (Doc. Nos. 291, 298) are considered pending motions by the Clerk, they are hereby denied as well.